UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | |
|---|---|
| RICHARD A. FOWLKES, | : |
| Plaintiff, | : Case No. 3:22-cv-27 |
| v. | : Judge Thomas M. Rose |
| DEPARTMENT OF DEFENSE, | : |
| Defendant. | : |

**ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 36)**

Currently before the Court is Defendant's Motion for Summary Judgment (the "Motion") (Doc. No. 36). In this employment dispute, Plaintiff Richard A. Fowlkes ("Fowlkes") has alleged that his former employer, the Department of the Air Force (the "Air Force"), terminated him due to his disability, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* (the "Rehabilitation Act"). (Doc. No. 6 at PageID 39-40.) Defendant Department of Defense (the "DOD"), the executive agency encompassing Air Force operations, has filed the instant Motion, arguing that Fowlkes' claim of disability discrimination here fails as a matter of law. (*See* Doc. No. 36 at PageID 1072.) In particular, the DOD submits that Fowlkes cannot make out a *prima facie* case of disability discrimination against the Air Force, and, even if he could, Fowlkes still cannot demonstrate that the Air Force's given reasons for terminating his employment were pretextual. (*Id.* at PageID 1073-81.) For the reasons explained herein, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. No. 36).

**I.      BACKGROUND**

1

### A. **Fowlkes and his Position with the Air Force**

Fowlkes is a former servicemember of the Air Force, who allegedly suffers from post-traumatic stress disorder ("PTSD") and major depressive disorder ("Depression"). (Doc. No. 47-1 at PageID 1584.) Fowlkes attests that he was diagnosed with PTSD and Depression in 1991 after witnessing a tragic fire that killed two children. (*Id.*; *see also* Doc. No. 33-1 at PageID 886.) It is unclear whether Fowlkes' alleged mental health diagnoses are derived from his Air Force service, or whether the events which triggered his ailments merely occurred while Fowlkes was an enlisted servicemember. In any event, Fowlkes was discharged from the Air Force in 1993. (Doc. No. 47-1 at PageID 1584.) Fowlkes purportedly takes medication for PTSD and Depression, but still suffers flashbacks and has trouble sleeping. (*Id.*; *see also* Doc. No. 33-1 at PageID 752-53.)

In 2018, the Air Force hired Fowlkes to work as career-conditional electronics engineer at Wright Patterson Air Force Base ("WPAFB"). (*See* Doc. No. 47-2 at PageID 1630.) Fowlkes' position was conditional insofar as he was required to perform satisfactorily over the course of a two-year probationary period. (*Id.*; *see also* Doc. No. 31-1 at PageID 584.) Generally, the Air Force sets out the following job-performance traits and contributions expected from electronics engineers:

> Technical knowledge of assigned competency area or considered fully proficient; may require minimal supervision and/or guidance.
>
> Independently defines, directs or leads highly challenging projects.
>
> Select supervisory positions at the branch/flight level. Tactically focused on supporting day-to-day operations/activities.
>
> Position contributes up to the highest level of duties/responsibilities of the NH-III Factors (Job Achievement and/or Innovation, Mission Support, Communication and/or Teamwork).

(Doc. No. 34-10 at PageID 998.) In addition to listing descriptors for these expected contributions,

the Air Force requires that electronics engineers possess commensurate knowledge and analytical skills, and the "[a]bility to communicate clearly, concisely, and with technical accuracy, both orally and in writing, as well as work in a professional manner with peers, management, contractors, academia, and other agencies." (Doc. No. 47-2 at PageID 1652-54.) Stating his own qualifications for the position, Fowlkes testifies that he holds master's degrees in computer engineering, electrical engineering, and renewable and clean engineering. (Doc. No. 47-1 at PageID 1585.)

Based on his educational background and the Air Force's needs, Fowlkes was appointed to work with WPAFB's F-15 Qatar ("QA") team. (Doc. No. 47-2 at PageID 1630.) The QA team served as a foreign military sales program whereby the Air Force would work with an outside-contractor, Boeing, to develop F-15 fighter jets to be delivered to the government of Qatar. (Doc. No. 40-1 at PageID 1098-101.) In essence, QA engineers like Fowlkes were expected to collaborate with each other and their Boeing counterparts, ensuring that planes being delivered to Qatar met the Air Force's required standards and desired specifications for foreign military sales. (*See id.* at PageID 1098-99.)

Fowlkes began his first day with the QA team on October 1, 2018. Not long after he started, Fowlkes informed his first-level supervisor, Donald Huckle ("Mr. Huckle") that he suffers from PTSD. (Doc. No. 30-1 at PageID 412.) Fowlkes requested that Mr. Huckle accommodate his PTSD by allowing for a flexible work schedule and by being understanding of his difficulties. (Doc. No. 33-1 at PageID 767-68.) Mr. Huckle agreed to accommodate Fowlkes along these lines informally because he felt that Fowlkes was not asking for any more consideration than he would give to any other employee. (Doc. No. 30-1 at PageID 412-13.) Until being terminated in September 2019, Fowlkes felt that his requests to Mr. Huckle were honored and "working

3

wonders." (Doc. No. 33-1 at PageID 776.)

### B. Fowlkes' Behavior at WPAFB

Shortly after Fowlkes began working at WPAFB, Fowlkes' personal vehicle briefly gave rise to security concerns. (Doc. No. 28-1 at PageID 290-91.) Fowlkes' second-level supervisor, Tobin Denney ("Mr. Denney"), received a call from security personnel about reports of a suspicious van in the base parking lot. (Doc. No. 28-1 at PageID 291.) The van—later revealed to belong to Fowlkes—was apparently run-down and fully filled with various junk items like paper, trash, and fuel cans. (*Id.* at PageID 291-92; Doc. No. 47-2 at PageID 1666.) Ultimately, Fowlkes was ordered to remove his van from the premises until it was cleaned up and he complied. (Doc. No. 47-2 at PageID 1666.)

However, Mr. Denney testified that Fowlkes' personal hygiene was a persistent issue throughout his tenure at WPAFB. (*See* Doc. No. 28-1 at PageID 271.) Multiple members of the QA team have corroborated this, stating that Fowlkes often looked dirty and disheveled, and maintained an unpleasant body odor. (Doc. Nos. 28-1 at PageID 271; 32-1 at PageID 641; 42-1 at PageID 1226-27; 45-1 at PageID 1501.) To illustrate, one QA team member allegedly kept a fan at their desk blowing in the direction of Fowlkes' cubicle to keep from having to smell him. (Doc. No. 42-1 at PageID 1230.) Notwithstanding, Fowlkes swears that he maintains good personal hygiene and states that nobody at WPAFB ever counseled him to the contrary. (Doc. No. 47-1 at PageID 1586.)

Mr. Denney also pointed to various emotional outbursts by Fowlkes. (Doc. No. 28-1 at PageID 271.) On one occasion, in May of 2019, Fowlkes responded to his Boeing counterpart's sarcasm by shouting and becoming so angry that he could not settle himself when a colleague tried to diffuse the situation. (Doc. No. 34-4 at PageID 941.) When counseled by management about

4

the incident, Fowlkes blamed his PTSD and explained that when triggered he is like "Bruce Banner transforming into the Incredible Hulk." (Doc. No. 47-1 at PageID 1587.) Fowlkes' management team offered to accommodate his PTSD in this vein by arranging for someone to sit in on calls with Fowlkes and help calm potentially triggering events before they occurred, but Fowlkes refused. (*Id.*) In July of 2019, at a staff meeting on suicide prevention and active shooter awareness, Fowlkes told the QA team that his PTSD made him the "poster child" of an active shooter, but that he was not in-fact an active shooter. (Doc. No. 40-1 at PageID 1117.) Fowlkes testified that he intended this statement to subvert stereotypes about PTSD. (Doc. No. 33-1 at PageID 773-74.) However, given Fowlkes' prior behavior, the QA team generally felt more frightened than anything by Fowlkes' statement. (Doc. No. 40-1 at PageID 1117.) In August of 2019, Fowlkes became so upset when discussing an issue with a colleague that a supervisor directed him to leave WPAFB and return when he had calmed down. (Doc. No. 34-3 at PageID 940; *see also* Doc. No. 47-1 at PageID 1587.)

Before any of these specific events, one supervisor on the QA team, Stephanie NeCamp[1] ("Ms. NeCamp"), took issue with Fowlkes' general attitude and demeanor. (*See* Doc. No. 42-1 at PageID 1198-99.) Ms. NeCamp reports that she perceived Fowlkes to behave passive/aggressively to supervisors and colleagues alike. (*Id.* at PageID 1215.) She also took special note of the fact that, during the holiday season of 2018, Fowlkes anonymously gifted chocolates exclusively to the women working on the QA team. (*Id.* at PageID 1222.) On balance, Fowlkes posits that Ms. NeCamp's listed concerns are either outright false or otherwise demonstrative of her prejudice against individuals with PTSD. (Doc. Nos. 33-1 at PageID 757; 47-1 at PageID 1585-86.) To that end, Fowlkes privately referred to Ms. NeCamp as "the lady manipulator." (Doc. No. 33-1 at

---

[1] Ms. NeCamp's name has since been changed to Stephanie Lohn. (Doc. No. 42-1 at PageID 1174.) The Court shall refer to her as Ms. NeCamp for the purpose of maintaining consistency throughout the record in this case.

5

PageID 756-57.)

## C. Fowlkes' Job-Performance at WPAFB

Management on the QA team, Ms. NeCamp in particular, further expressed issues regarding Fowlkes' performance of his duties while employed at WPAFB. (Doc. No. 34-2 at PageID 934-38.) At the time, Ms. NeCamp was not in Fowlkes' official chain of command. (*See* Doc. No. 47-2 at PageID 1826.) Even so, Fowlkes was directed to work under Ms. NeCamp's supervision to complete technical evaluations for the QA team to use in contract negotiations with Boeing. (Doc. No. 42-1 at PageID 1219-20.) Ms. NeCamp also supervised Fowlkes more generally when Mr. Huckle and Mr. Denney were out on leave, as was the case in December 2018. (Doc. No. 42-1 at PageID 1216, 1220.)

Ms. NeCamp required QA team engineers to complete drafts of their assigned technical evaluations by December 31, 2018. (*See* Doc. No. 42-2 at PageID 1263-64.) Final drafts of technical evaluations were due by the end of January 2019. (*Id.* at PageID 1263.) Fowlkes was the only QA team engineer to not complete drafts of his technical evaluations before the new year. (*Id.* at PageID 1264.) Fowlkes believed that he needed additional information from Boeing to complete his drafts. (Doc. No. 47-1 at PageID 1586.) Ms. NeCamp assured Fowlkes that he was seeking information of little-to-no consequence in the grand scheme of the QA project, but Fowlkes disagreed. (Doc. No. 42-2 at PageID 1276.) Instead, Fowlkes went to his colleagues and attempted to convince them to agree with his position. (*Id.* at PageID 1269-70.) This would be a trend any time one of Fowlkes' supervisors disagreed with him. (Doc. No. 45-1 at PageID 1501.) Fowlkes was also known to elevate such points of disagreement to people above his immediate supervisors in the QA team's chain of command. (Doc. No. 42-2 at PageID 1297.)

These performance issues were documented in a mid-year assessment prepared for Fowlkes by Mr. Huckle in May of 2019. (Doc. No. 47-2 at PageID 1661-62.) Fowlkes' assessment acknowledged necessary improvements respecting the detail needed to sufficiently complete technical evaluations, clear and concise communications, and communicating at the appropriate level in the chain of command. (*Id.*) The mid-year assessment further highlighted some of Fowlkes' behavioral issues—primarily, the adversarial nature of Fowlkes' communications and interactions with Boeing contractors. (*Id.* at PageID 1662.) Still, Fowlkes scored within the satisfactory performance range on his assessment. (*Id.* at PageID 1659.) Yet, Mr. Huckle testified that he meant for Fowlkes' mid-year assessment to communicate areas of performance that needed to be improved to maintain continued employment at WPAFB. (Doc. No. 30-1 at PageID 444.) There is no evidence that sentiment was conveyed to Fowlkes.

### D. Fowlkes' Termination

On May 8, 2019, directly following the above-described incident involving Fowlkes' angry outburst directed toward one of his Boeing counterparts, QA team leadership began considering Fowlkes' termination. (Doc. No. 28-1 at PageID 320.) By July 24, 2019, management personnel became adamant about getting human resources officials involved in terminating Fowlkes' employment. (*See* Doc. No. 34-13 at PageID 1018.) By August 7, 2019, Mr. Huckle reported to human resources that issues with Fowlkes had gotten worse for the QA team. (*Id.* at PageID 1017.) Mr. Huckle then received a response, communicating that, because Fowlkes was a probationary employee, management's concerns warranted termination. (*Id.* at PageID 1016.) Mr. Huckle agreed and Fowlkes' employment with the Air Force was terminated on September 16, 2019. (Doc. Nos. 34-12 at PageID 1012-15; 34-13 at PageID 1016; 47-2 at PageID 1657.)

### E. Procedural History

7

Fowlkes filed his initial Complaint in this matter on January 27, 2022. (Doc. No. 1.) On July 23, 2022, Fowlkes filed his Amended Complaint for Disability Discrimination and Whistleblower Retaliation (the "Amended Complaint") (Doc. No. 6). Therein, Fowlkes alleges discrimination on the basis of his disability and whistleblower retaliation. (Doc. No. 6 at PageID 39-41.) Fowlkes has since voluntarily dismissed his whistleblower retaliation claim. (Doc. Nos. 12, 15.) Therefore, the only remaining claim at issue in this action is Fowlkes' claim that the Air Force terminated him based on his disability, in violation of the Rehabilitation Act.

After no shortage of discovery delays, the DOD filed its present Motion on October 21, 2024. (Doc. No. 36.) Fowlkes was granted an extension of time to respond to the Motion when plaintiff's counsel mis-calendared his client's response date, and, Fowlkes filed his Memorandum in Opposition to the Defendant's Motion (Doc. No. 47) on November 20, 2024. The DOD timely submitted reply briefing on December 11, 2024. (Doc. No. 54.) The DOD's Motion is now ripe for review and decision.

II. **STANDARD OF REVIEW**

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought" and that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, affidavits or sworn declarations, and

admissions on file, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(a), (c).

The burden then shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. *Id*. at 248-49. It also is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Additionally, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id*. at 255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid

summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id*. The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id*.

### III. ANALYSIS

As an initial matter, the Court sets out the appropriate legal framework to use in analyzing Fowlkes' claim of disability discrimination under the Rehabilitation Act. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability … be subjected to discrimination under any program or activity … conducted by an Executive agency" of the United States. 29 U.S.C. § 794(a). Moreover, when determining whether a qualified individual has been subjected to unlawful disability discrimination under the Rehabilitation Act, courts must utilize the same standards as those set forth in "title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.* (the "ADA"). 29 U.S.C. § 794(d). The ADA defines disability discrimination, in part, as "excluding or otherwise denying equal jobs or benefits to a qualified individual because of [a] known disability …." 42 U.S.C. § 12112(b)(4).

When a plaintiff relies on circumstantial evidence to prove his claim of disability discrimination, as Fowlkes does here, courts consider that claim using the burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023) (citing *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008)). Pursuant to *McDonnell Douglas* the "plaintiff has the initial burden of demonstrating" the elements of his claim. *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 727 (6th Cir. 2007). In other words, the plaintiff must first establish a *prima facie* case of discrimination. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706

10

(6th Cir. 2006).  If the plaintiff succeeds, then "the burden of production shifts to the employer to identify a legitimate, nondiscriminatory reason for the termination." *Sullivan v. Coca-Cola Bottling Co.*, 182 F. App'x. 473, 477 (6th Cir. 2006) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  If the employer does so, then the burden shifts back to the plaintiff to prove "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Sullivan*, 182 F. App'x. at 477 (quoting *Burdine*, 450 U.S. at 253)).  "Throughout the analysis, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Sullivan*, 182 F. App'x. at 477 (quoting *Burdine*, 450 U.S. at 253).

For a plaintiff to establish a *prima facie* case of disability discrimination in the employment context, he must show: "(1) that he is disabled, (2) that he is otherwise qualified for the job, with or without reasonable accommodation, (3) that he suffered an adverse employment action, (4) that his employer knew or had reason to know of his disability, and (5) that, following the adverse employment action, either he was replaced by a nondisabled person or his position remained open." *Bledsoe v. Tenn. Valley Auth. Bd. of Directors*, 42 F.4th 568, 578 (6th Cir. 2022) (quoting *Jones v. Potter*, 488 F.3d 397, 403-04 (6th Cir. 2007)) (internal quotation marks omitted).  In Fowlkes' case, the DOD does not dispute that Fowlkes was subjected to adverse employment action by the Air Force, nor does the DOD claim that the Air Force had no reason to know of Fowlkes' purported disability.  Rather, the DOD contends Fowlkes cannot establish that he is disabled within the meaning of the Rehabilitation Act and the ADA, and, that he was not otherwise qualified for his job at WPAFB.  (Doc. No. 36 at PageID 1073-77.)

The Court addresses each disputed element of Fowlkes' *prima facie* case in turn.  Because the Court ultimately finds that Fowlkes has failed to make out a *prima facie* case of disability

11

discrimination, the Court need not consider whether the DOD's proffered reasoning for Fowlkes' termination was pretextual.

### A. Disability

Fowlkes alleges that he is disabled by virtue of his PTSD and Depression. (Doc. No. 47-1 at PageID 1584.) Despite extending discovery in this case to obtain them, Fowlkes has failed to submit medical records of his diagnoses for the Court's review. (*See* Notation Order, at 4/26/2024.) However, the DOD does not clearly challenge whether Fowlkes does in-fact have PTSD and Depression. (Doc. No. 36 at PageID 1074.) Thus, for the sake of addressing his claim on the merits, the Court will assume that Fowlkes possesses the ailments he says he does.

Turning then to the Parties' arguments, the DOD posits that Fowlkes is unable to prove that he is disabled within the meaning of the ADA, nonetheless. (*Id.* at PageID 1073-75.) Specifically, the DOD argues that Fowlkes' PTSD and Depression are not so severe as to substantially limit one or more of his major life activities, as required by the ADA. (*Id.* at PageID 1074.) Fowlkes responds contra, claiming that he has a 70% disability rating from the Department of Veterans Affairs and he takes medications which only regulate his PTSD and Depression if he is not subject to certain triggering events. (Doc. No. 47 at PageID 1576.)

Pertinent to Fowlkes' case, the term "disability," as used in the Rehabilitation Act and the ADA, is defined as "a physical or mental impairment that substantially limits one or more major life activities …." 42 U.S.C. § 12102(1)(A). For the purposes of this definition, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). What's more, impairments like PTSD and Depression are presumed to impose a substantial limit

on an individual's brain function. *Garibay v. Hamilton Cnty., Tenn.*, 496 F. Supp. 3d 1140, 1146 (E.D. Tenn. 2020) (quoting 29 C.F.R. § 1630.02(j)(3)(ii)).

In this instance, assuming Fowlkes has been diagnosed with PTSD and Depression, the Court finds Fowlkes has produced sufficient evidence that his impairments substantially limit one or more major life activities to create a genuine dispute of material fact. At bottom, Fowlkes' PTSD and Depression are presumed to limit his brain function such that his impairments constitute a disability. Practically, Fowlkes has testified that he frequently has difficulty sleeping due to flashbacks and nightmares related to his PTSD. (Doc. No. 33-1 at PageID 752-53.) In this respect, whether others perceive Fowlkes' impairments to be episodic or mild is irrelevant. *Garibay*, 496 F. Supp. 3d at 1146 (quoting 42 U.S.C. § 12102(4)(D)) ("an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active"). It only matters that Fowlkes seems to experience his disability when it is active. *Id.* Viewing Fowlkes' undisputed testimony in his favor, a reasonable jury could easily determine that Fowlkes is disabled. Therefore, the Court finds that Fowlkes has satisfied this element of his *prima facie* case for purposes of summary judgment.

### B. Otherwise Qualified

Next, the Court considers whether Fowlkes was otherwise qualified for his job as an electronics engineer at WPAFB, with or without reasonable accommodation. The DOD contends Fowlkes was not otherwise qualified for his position because he demonstrated an inability to perform the essential job functions of an electronics engineer. (Doc. No. 36 at PageID 1075-77.) Chiefly, the DOD points to Fowlkes' failure to timely complete his technical evaluations and lack of professionalism as evidence that Fowlkes was unqualified. (*Id.* at PageID 1075.) However, Fowlkes states that he was more than qualified for his role as an electronics engineer. (Doc. No.

47 at PageID 1577-78.) Fowlkes argues that he received a satisfactory mid-year assessment from Mr. Huckle and "the only factor that limited his successful performance was the level of hostility he encountered in his work environment." (*Id.* at PageID 1577.)

A disabled individual is otherwise qualified for his position if he "can perform the essential functions of the job with or without reasonable accommodation." *Keith v. Cnty. of Oakland*, 703 F.3d 918, 925 (6th Cir. 2013) (citing 42 U.S.C. § 12111(8)) (internal quotation marks omitted). Essential functions of a job are defined as "'fundamental job duties of the employment position the individual with a disability holds.'" *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010) (quoting 29 C.F.R. § 1630.2(n)(1)). "A job function may be considered essential because: (1) the position exists to perform that function; (2) there are a limited number of employees available among whom the performance of that job function can be distributed; or (3) the function is highly specialized so that the incumbent in the position is hired for [his] expertise or ability to perform the particular function. *Keith*, 703 F.3d at 925 (citing 29 C.F.R. § 1630.2(n)(2)).

Generally, courts will give consideration to "the employer's judgment as to what functions of a job are essential." *Jakubowski*, 627 F.3d at 201 (quoting 29 C.F.R. § 1630.2(n)(1)) (internal quotation marks omitted). An employer's judgment can often be adduced based on "any written job descriptions prepared prior to advertising and interviewing applicants for the job at issue." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391-92 (6th Cir. 2017). "When accommodation is necessary to enable a plaintiff to perform the essential functions of the position in question, it is the plaintiff's burden to propose an accommodation that is 'objectively reasonable.'" *Keith*, 703 F.3d at 927 (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007)).

14

Here, the Court finds that, despite his education, Fowlkes was not otherwise qualified for his position on the QA team at WPAFB. The overwhelming majority of Fowlkes' issues throughout his tenure at WPAFB relate to his unprofessional communications and erratic, sometimes threatening, behavior. Based on the specialized nature of Fowlkes' job as an electronics engineer, it stands to reason that an individual in Fowlkes' position would be hired, at least in part, to communicate engineering concepts in a professional and thoughtful manner. Indeed, the Air Force's job description here lists the "[a]bility to communicate clearly, concisely, and with technical accuracy, both orally and in writing, as well as work in a professional manner with peers, management, contractors, academia, and other agencies" as a prerequisite qualification. (Doc. No. 47-2 at PageID 1654.)

Fowlkes reportedly did not communicate clearly and concisely, or in a professional manner, during his employment at WPAFB. (Doc. No. 47-2 at PageID 1661-62.) Fowlkes' mid-year assessment indicates that he was known to communicate unclear conclusions, belabor inconsequential details, unnecessarily disregard his chain of command, and generally treat colleagues, supervisors, and Boeing contractors as adversaries. (*Id.*) This is to say nothing of Fowlkes' poor hygiene, angry outbursts, his tendency to be passive/aggressive, or his off-color statements about transforming into the Incredible Hulk or being the poster child of an active shooter. Cumulatively, this behavior not only fails to satisfy the essential communicative functions of an electronics engineer, but it runs afoul of basic civility. *Cooper v. Coca-Cola Consolidated, Inc.*, No. 3:20-cv-362, 2023 U.S. Dist. LEXIS 53938, at *17, 2023 WL 2700703, at *6 (E.D. Tenn. Mar. 29, 2023) (quoting *DiFrancesco v. Aramark Corp.*, Civ. Act. No. 04-5647, 2006 WL 8459587, *7 (E.D. Penn. March 15, 2006)) ("We find as a matter of law that basic civility is an essential function of any job that requires interaction with the public").

In addition, the record in this case indicates that no accommodation could have been expected to render Fowlkes otherwise qualified for his position. Fowlkes himself says that he informally received accommodations in the way of a flexible schedule and understanding of his struggle with PTSD. (Doc. No. 47-1 at PageID 1585.) To be sure, Fowlkes considered his request to be honored and "working wonders." (Doc. No. 33-1 at PageID 776.) The fact that his informal accommodations were not actually working wonders is itself telling of Fowlkes' qualifications. More importantly, Fowlkes has not proposed any other objectively reasonable accommodations here. The Court can only discern that Fowlkes' managers tried to at least accommodate his adversarial nature and emotional outbursts by arranging for an intermediary to accompany him in calls and meetings, to no avail. (Doc. No. 47-2 at PageID 1587.) It would appear that the only accommodation Fowlkes had in mind was for his managers to permit him to use his PTSD as an excuse to run roughshod over all those around him at WPAFB. Such an accommodation is untenable and, therefore, objectively unreasonable.

The Court finally finds Fowlkes' current employment as a senior software engineer (Doc. No. 47-1 at PageID 1588) unpersuasive in proving his qualification for his position at WPAFB. The only evidence of any similarity between the two jobs comes from Fowlkes' own conclusory statements. Without more—like, for instance, a job description for Fowlkes' current position—the Court finds that Fowlkes' statements do nothing to actually evidence his qualification for the electronics engineer role at issue here.

In all, to use Fowlkes' own analogy, Bruce Banner might be a qualified scientist, but the Incredible Hulk is not, and, if Bruce cannot control his alter-ego, his cohorts are justified in barring him from the lab. Accordingly, the Court finds that Fowlkes was not otherwise qualified for his job as an electronics engineer at WPAFB.

### C. Replacement by Nondisabled Individual

Finally, the Court notes that no facts or arguments have been put forth regarding the final element of Fowlkes' *prima facie* case—that Fowlkes was replaced by a nondisabled individual or his position remained open. In the absence of any facts to inform the Court's consideration of this element, the Court must find that it is not satisfied. Consequently, Fowlkes' claim of disability discrimination likewise fails as a matter of law in this regard.

### IV. CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. No. 36). The Court's ruling here is dispositive of Fowlkes' Amended Complaint and the Clerk is directed to **TERMINATE** this matter on the Court's docket.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, February 3, 2025.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE